[No. E029823. Fourth Dist., Div. Two. Nov. 27, 2002.]

HARRY GIBSON et al., Plaintiffs and Appellants, v.
WORLD SAVINGS AND LOAN ASSOCIATION, Defendant and
Respondent.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for
publication with the exception of part B.

**COUNSEL**

Blumenthal Ostroff & Markham, Norman B. Blumenthal, David R. Markham, Sheldon A. Ostroff, Barron E. Ramos; Chavez & Gertler and Mark Chavez for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Ronald A. Reiter and Michele R. Van Gelderen, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Joseph A. Wynne; Steefel, Levitt & Weiss, Barry W. Lee, Anthony J. Justman, Jacqueline H. Sung and James W. Colbert III for Defendant and Respondent.

Stroock & Stroock & Lavan, Julia B. Strickland, Lisa M. Simonetti and Andrew W. Moritz for Western League of Savings Institutions as Amicus Curiae on behalf of Defendant and Respondent.

Carolyn J. Buck, Thomas J. Segal, and Paul K. Hutson for The Office of Thrift Supervision as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**McKINSTER, Acting P. J.**—In a class action accusing a federally chartered savings association of committing unfair business practices, the trial court found that federal law preempts the plaintiffs' claim and entered judgment in favor of the defendant. The plaintiffs appeal. Finding that the trial court's belief that the action was preempted was mistaken and that the defendant has not demonstrated any other ground on which to affirm the judgment, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

In April of 1996, Harry Gibson and Joyce A. Gibson, on behalf of themselves and all other persons similarly situated, sued World Savings and Loan Association. In substance, the complaint alleges: that the potential class members are borrowers under secured loans made or serviced by World; that those borrowers failed to maintain hazard insurance on the real property securing the loans; that although it was entitled to simply reinstate the borrowers' insurance policies, World purchased replacement hazard insurance (forced order insurance or FOI) from an insurer of its own choice; that those FOI policies were much more expensive than the borrowers' policies; that World benefited financially from purchasing the more expensive policies; and that by charging the borrowers for the full price of the FOI policies, World violated the terms of the borrowers' deeds of trust, which authorized World to advance funds on behalf of the borrowers only to the extent necessary to protect World's rights. On the basis of those allegations, the complaint prays for relief on the theories of breach of contract, breach of the implied covenant of good faith and fair dealing, unfair business practices, conversion, unjust enrichment, and declaratory relief.

In August of 1999, the plaintiffs dismissed all claims except that for injunctive relief and restitution under the unfair competition law (Bus. Prof. Code, § 17200 et seq.; UCL) for World's allegedly unfair business practices. Thereafter, the plaintiffs abandoned their claim for injunctive relief. Accordingly, the issues presented by plaintiffs at trial were whether World's FOI

charges violated the UCL and, if so, the amount of the restitution to be ordered. By that time, the plaintiffs had abandoned any challenge to World's decision to buy FOI policies rather than to reinstate the plaintiffs' less expensive policies. Instead, they argued that the amounts World charged to the plaintiffs for FOI were too high because they included the cost both of replacement hazard insurance and of administrative services provided to World by the FOI insurer. They also argued that World had falsely represented that the FOI premiums charged to the plaintiffs were equal to the real cost of that insurance to World. In response, World contended that the plaintiffs' contentions are preempted by federal law, that the plaintiffs' challenge to FOI premiums can only be resolved by the California Department of Insurance (CDI), that its practices are not unfair or deceptive, and that restitution is not a proper remedy.

The trial court found that World is a federally chartered savings association and that it purchases FOI from Balboa Insurance Company. The premium charged to World by Balboa includes, not only the cost of the replacement hazard insurance, but also the administrative costs associated with tracking hazard insurance coverage. Moreover, the defaulting borrowers were not charged merely for those tracking services relating to their particular loans. Instead, the premiums compensated Balboa for tracking World's entire loan portfolio, including loans to which the FOI program could not apply.

The trial court concluded, however, that the plaintiffs' challenge to World's practice of charging its defaulting borrowers for the entire bundle of services provided to it by Balboa is preempted by federal law. Were it not preempted from doing so, the court said, it would have found that, by charging its defaulting borrowers an insurance premium that includes unrelated tracking costs that benefit only World, World had violated the terms of the plaintiffs' deeds of trust and had engaged in unfair business practices under Business and Professions Code section 17200.

In accordance with its finding of preemption, the trial court entered judgment in favor of World. The plaintiffs appeal.

CONTENTIONS

The plaintiffs and an amicus curiae on their behalf, the California Attorney General, contend that the trial court erred in concluding that the plaintiffs' challenge to World's FOI practices is preempted by federal law. World and an amicus curiae in support of its position, the federal Office of Thrift Supervision, dispute that contention. In addition, World and a second amicus

curiae on its behalf, the Western League of Savings Institutions, contend that, not only is the action preempted, but even if it were not, judgment in its favor would still be required. In particular, they argue that the judgment should be affirmed because: the plaintiffs' claim is within the primary jurisdiction of the CDI; the matter is within the exclusive jurisdiction of the Insurance Commissioner; the claim is barred by the "filed rate" doctrine; the plaintiffs are improperly seeking damages rather than restitution; World's FOI practices are not unfair; and the enforcement of the claim would constitute improper microeconomic regulation of business.

## ANALYSIS

### A. The Plaintiffs' Claims Are Not Federally Preempted.

#### 1. The Law of Federal Preemption in General.

 The federal Constitution directs that "the laws of the United States . . . shall be the supreme law of the land; . . . any Thing in the Constitution or laws of any state to the contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) State laws can be contrary to, and thus preempted by, federal law "in either of two general ways. [1] If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. [Citations.] [2] If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, [citations], or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." (*Silkwood v. Kerr-McGee Corp.* (1984) 464 U.S. 238, 248 [104 S.Ct. 615, 621, 78 L.Ed.2d 443].)

" 'It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so.' " (*New York Dept. of Social Services v. Dublino* (1973) 413 U.S. 405, 413 [93 S.Ct. 2507, 2513, 37 L.Ed.2d 688], quoting *Schwartz v. Texas* (1952) 344 U.S. 199, 202-203 [73 S.Ct. 232, 235, 97 L.Ed. 231].) Accordingly, "[w]hether federal law preempts state law is fundamentally a question whether Congress has intended such a result." (*Peatros v. Bank of America* (2000) 22 Cal.4th 147, 157 [91 Cal.Rptr.2d 659, 990 P.2d 539].) Congressional intent to preempt may be either express or implied, i.e., either " 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " (*Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 152-153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664].) However, courts are "generally reluctant to infer preemption . . . ." (*Exxon*

*Corp. v. Governor of Maryland* (1978) 437 U.S. 117, 132 [98 S.Ct. 2207, 2217, 57 L.Ed.2d 91].)

Preemption may result, not only from action taken by Congress itself, but also from action by a federal agency. (*Louisiana Public Service Com'n v. FCC* (1986) 476 U.S. 355, 369 [106 S.Ct. 1890, 1898-1899, 90 L.Ed.2d 369].) A regulation's preemptive effect "does not depend on express congressional authorization to displace state law." (*Fidelity Federal Sav. & Loan Assn. v. de la Cuesta, supra,* 458 U.S. at p. 154 [102 S.Ct. at p. 2023].) Instead, the determinative issues are whether (1) the agency intended its regulation to have a preemptive effect and (2) the agency acted within the scope of its congressionally delegated authority by issuing the preemptive regulation. (*Ibid.*) So long as those conditions are met, "[f]ederal regulations have no less pre-emptive effect than federal statutes." (*Id.* at p. 153 [102 S.Ct. at p. 2002].)

" '[T]he construction of statutes and the ascertainment of legislative intent are purely questions of law.' " (*Bravo Vending v. City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 391 [20 Cal.Rptr.2d 164], quoting *Burnsed v. State Bd. of Control* (1987) 189 Cal.App.3d 213, 218, fn. 3 [234 Cal.Rptr. 316].) The same is true for the interpretation of administrative regulations. (*Home Depot, U.S.A., Inc. v. Contractors' State License Bd.* (1996) 41 Cal.App.4th 1592, 1599 [49 Cal.Rptr.2d 302].) Accordingly, we determine the preemptive effect of either statutes or regulations independently (*ibid.*), without deferring to the trial court's conclusion or limiting ourselves to the evidence of intent considered by the trial court (*Bravo Vending*, at pp. 391-392).

## 2. *The HOLA, the OTS, and Its Regulations.*

Federally chartered savings associations are regulated by the Home Owners' Loan Act (HOLA), codified in title 12 of the United States Code, beginning with section 1461. As amended, the HOLA creates the Office of Thrift Supervision (OTS) (12 U.S.C. § 1462a(a)) and authorizes its director to issue regulations prescribing the operation of federal savings associations according to the "best practices of thrift institutions in the United States" (*id.*, § 1464(a)(2)).

Pursuant to that authority, the predecessor to the OTS promulgated 12 Code of Federal Regulations section 545.2 (2002) (section 545.2), which provides: "The regulations of this Part 545 are promulgated pursuant to the plenary and exclusive authority of the [OTS] to regulate all aspects of the operations of Federal savings associations, as set forth in section 5(a) of the

[HOLA]. This exercise of the [OTS's] authority is preemptive of any state law purporting to address the subject of the operations of a Federal savings association."

In 1996, the OTS issued 12 Code of Federal Regulations section 560.2 (2002) (section 560.2) to address preemption specifically in the context of lending operations. (61 Fed.Reg. 50951, 50952 (Sept. 30, 1996).) Section 560.2 states that the "OTS hereby occupies the entire field of lending regulation for federal savings associations," thereby permitting federal savings associations to extend credit "without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section . . . ." (§ 560.2(a).) It illustrates the scope of the preemption by listing various examples of the types of "requirements" that are within the field of exclusive regulation (§ 560.2(b)) and then specifying the types of laws that are outside that field (§ 560.2(c)).[1]

---

[1]Section 560.2 provides as follows:

"(a) Occupation of field. Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision.

"(b) Illustrative examples. Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

"(1) Licensing, registration, filings, or reports by creditors;

"(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;

"(3) Loan-to-value ratios;

"(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

"(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

"(6) Escrow accounts, impound accounts, and similar accounts;

"(7) Security property, including leaseholds;

"(8) Access to and use of credit reports;

### 3. *UCL Claims Are Not Preempted by Section 545.2.*

It is well established in California that claims for relief under the UCL and related state laws are not preempted by section 545.2.

For instance, in *Fenning v. Glenfed, Inc.* (1995) 40 Cal.App.4th 1285 [47 Cal.Rptr.2d 715], the plaintiff alleged that a federal savings association had engaged in deceptive business practices and sought relief for violation of the UCL, fraud, and negligent misrepresentation. (*Id.* at p. 1289.) The court rejected the savings association's assertion that the plaintiffs' claims were preempted by section 545.2, explaining that "the Bank's argument that, by permitting fraud and unfair trade practices suits, the state is regulating the Bank's conduct, is off the mark. Plaintiffs' ability to sue the Bank for fraud does not interfere with what the Bank may do, that is, how it may conduct its operations; it simply insists that the Bank cannot misrepresent how it operates, or employ fraudulent methods in its operations. Put another way, the state cannot dictate to the Bank how it can or cannot operate, but it can insist that, however the Banks chooses to operate, it do so free from fraud and other deceptive business practices." (*Fenning,* at p. 1299, fn. omitted.)

Similarly, in *People ex rel. Sepulveda v. Highland Fed. Savings & Loan* (1993) 14 Cal.App.4th 1692 [19 Cal.Rptr.2d 555], the plaintiffs accused a lender of operating apartments that did not comply with habitability laws (*id.* at p. 1700) and sought relief under a variety of theories, including UCL,

"(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

"(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

"(11) Disbursements and repayments;

"(12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f-7a and part 590 of this chapter and 12 U.S.C. 1463(g) and § 560.110 of this part; and

"(13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j-3 and part 591 of this chapter.

"(c) State laws that are not preempted. State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

"(1) Contract and commercial law;

"(2) Real property law;

"(3) Homestead laws specified in 12 U.S.C. 1462a(f);

"(4) Tort law;

"(5) Criminal law; and

"(6) Any other law that OTS, upon review, finds:

"(i) Furthers a vital state interest; and

"(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section." (Italics omitted.)

fraud, and breach of warranty (*id.* at pp. 1701-1702, fn. 4). The court found that neither the HOLA nor the OTS's regulations expressly preempted the actions under either the state common law or the statutory action for unfair business practices. (*Id.* at p. 1708.) Nor were they impliedly preempted, because their effect on the operations of the savings association was incidental rather than direct. (*Id.* at p. 1711; and see *Siegel v. American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953, 958-964 [258 Cal.Rptr. 746] [rejecting both express and implied preemption of UCL and numerous common law claims].)

### 4. *The Plaintiffs' UCL Claims Are Not Preempted by Section 560.2.*

■ The plaintiffs contend that, just as section 545.2 did not preempt the UCL actions described above, the preemption defined by section 560.2 does not extend to their action to recover restitution under the UCL for unfair or deceptive business practices. The Attorney General of California supports that contention as an amicus curiae. It is disputed by World and the OTS, appearing as an amicus curiae on behalf of World.

Before beginning our exploration of their respective arguments, we make two preliminary observations.

■ First, as with any other issue arising under the supremacy clause of the United States Constitution, our analysis " 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' " (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407], quoting *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447].) The states' historic police powers include the regulation of consumer protection in general and of the banking and insurance industries in particular. (*Smily v. Citibank* (1995) 11 Cal.4th 138, 148 [44 Cal.Rptr.2d 441, 900 P.2d 690]; *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 240 [32 Cal.Rptr.2d 807, 878 P.2d 566].) Therefore, there is a "strong presumption" (*Cipollone*, at p. 523 [112 S.Ct. at p. 2621]) that section 560.2 does not preempt the claims brought in this action. To overcome that presumption against preemption, World bears the burden of establishing that the claims are preempted. (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503].)

Second, no issue of implied preemption is before us. When Congress adopts legislation that includes a provision expressly addressing the issue of preemption, there is no need to infer congressional intent. (*Cipollone v.*

*Liggett Group, Inc., supra,* 505 U.S. at p. 517 [112 S.Ct. at p. 2618].) "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." (*Ibid.*) The same reasoning applies here, where the express statement of preemptive intent is included in an administrative regulation rather than a statute. The question, therefore, is whether the scope of the express preemption extends to the claims at issue here.

### a. *No Preemption Under Cipollone v. Liggett Group, Inc.*

The method by which the scope of preemption is determined was explained by the United States Supreme Court when it decided the preemptive effect of the Federal Cigarette Labeling and Advertising Act. (*Cipollone v. Liggett Group, Inc., supra,* 505 U.S. at p. 523 [112 S.Ct. at p. 2621].) Since then, the same method has been applied by California courts both in that context (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1066-1067 [31 Cal.Rptr.2d 358, 875 P.2d 73]) and in others (see, e.g., *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 335 [93 Cal.Rptr.2d 36, 993 P.2d 366] [Federal Insecticide, Fungicide, and Rodenticide Act]). We " 'must fairly but—in light of the strong presumption against pre-emption—narrowly construe the precise language of [the preemptive statute or regulation] and we must look to each of [the plaintiffs' state] law claims to determine whether it is in fact pre-empted.' " (*Mangini,* at pp. 1066-1067, quoting *Cipollone,* at pp. 523-524 [112 S.Ct. at pp. 2621-2622].) As to each state law claim, the central inquiry is whether the legal duty that is the predicate of the claims constitutes a requirement or prohibition of the sort that federal law expressly preempts. (*Cipollone,* at p. 524 [112 S.Ct at at pp. 2621-2622]; *Etcheverry,* at p. 335; *Mangini,* at p. 1067.)

The plaintiffs claim that World's FOI practice was an unfair business practice because the premium charged by World to the borrower was higher than the cost of that insurance to World, in violation of the terms of the deeds of trust between the plaintiffs and World, which entitled World to advance only such sums as were "necessary" to protect its security. They also claim that the practice was a fraudulent business practice because World misrepresented the cost of the replacement hazard insurance. The trial court found both claims to be true.

Those claims are predicated on the duties of a contracting party to comply with its contractual obligations and to act reasonably to mitigate its damages in the event of a breach by the other party, on the duty not to misrepresent material facts, and on the duty to refrain from unfair or deceptive business practices.

Those predicate duties are not requirements or prohibitions of the sort that section 560.2 preempts. That section preempts (1) state laws that (2) either purport to regulate federal savings associations or otherwise materially affect their credit activities. The predicate duties underlying the plaintiffs' claims do not meet that description.

The plaintiffs' principal complaint concerns the violation of contractual duties. Contractual duties are voluntarily undertaken by the parties to the contract, not imposed by state law. (*Cipollone v. Liggett Group, Inc., supra*, 505 U.S. at p 526 [112 S.Ct. at pp. 2622-2623].) A stated intent to preempt requirements or prohibitions imposed by state law does not reasonably extend to those voluntarily assumed in a contract.

Moreover, none of the predicate duties are directed toward federal savings associations. Instead, the duties on which the plaintiffs' claims are predicated govern, not simply the lending business, but anyone engaged in any business and anyone contracting with anyone else. On their face, they do not purport to regulate federal savings associations and are not specifically directed toward them. Nor is there any evidence that they were designed to regulate federal savings associations more than any other type of business, or that in practice they have a disproportionate impact on lending institutions. Any effect they have on the lending activities of a federal savings association is incidental rather than material.

Accordingly, the plaintiffs' claims are not preempted by section 560.2. The trial court erred in concluding otherwise.[2]

b. *No Preemption Under the OTS's Formula.*

Our conclusion is the same if we employ an analysis suggested by the OTS rather than that prescribed by the United States Supreme Court. At the time it promulgated section 560.2, the OTS explained the manner in which it intended that section to be applied when determining whether a particular provision of state law is preempted: "[T]he first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be

---

[2]Because we conclude that the plaintiffs' claims are outside the scope of section 560.2, we need not decide the Attorney General's assertion that section 560.2 is void because it exceeds the congressional authority delegated to the OTS. (See *Perdue v. Crocker National Bank, supra*, 38 Cal.3d at p. 938-941.)

shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption." (61 Fed.Reg. 50951, 50966-50967 (Sept. 30, 1996).)

Even were we to ignore the contractual nature of the principal obligation that the plaintiffs seek to enforce, applying this three-step formula to the plaintiffs' claims shows that they are not preempted.

First, the types of laws that the plaintiffs seek to enforce are not listed in subdivision (b) of section 560.2. The plaintiffs seek to enforce a general proscription of unfair business practices. More specifically, the plaintiffs rely upon legal principles regarding the need to comply with contracts and the requirement to refrain from deceptive conduct. Although World is alleged to have violated those laws in the context of lending relationships with the plaintiffs, in the abstract the laws themselves do not relate to any of the subjects listed in subdivision (b).

Moving to the second step, the laws do affect lending businesses, just as they affect any other business that enters into contracts or makes representations during the course of its operations. Therefore, under the OTS's interpretation of the regulation, a presumption of preemption arises.

However, that presumption is rebutted if the laws at issue are general contract and commercial laws that only incidentally affect lending operations. In determining whether the effect of those laws is more than incidental, we are guided by OTS's own explanation of the intended scope of its regulatory preemption. At the time section 560.2 was issued, OTS stated that "the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions . . . ." (61 Fed.Reg. 50951, 50966 (Sept. 30, 1996).) Accordingly, section 560.2 does not "preempt basic state laws such as state uniform commercial codes and state laws governing real property, contracts, torts, and crimes." (*Ibid.*) The limitation that the effect of those laws on lending cannot be more than incidental is intended to catch "state laws that may be designed to look like traditional property, contract, tort, or commercial laws, but in reality are aimed at other objectives, such as regulating the relationship between lenders and borrowers, protecting the safety and soundness of lenders, or pursuing other state policy objectives." (*Ibid.*)

The duties to comply with contracts and the laws governing them and to refrain from misrepresentation, together with the more general provisions of the UCL, are principles of general application. They are not designed to

regulate lending and do not have a disproportionate or otherwise substantial effect on lending. To the contrary, they are part of the legal infrastructure that undergird all contractual and commercial transactions. Therefore, their effect is incidental and they are not preempted.

 c. *World's Authorities Do Not Support Preemption in This Instance.*

In resisting our conclusion that the plaintiffs' claims are not preempted by section 560.2, World notes that courts in California and two other states have found particular unfair competition claims to be preempted. But those claims are materially different from the ones before us.

For instance, the California case—*Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606 [115 Cal.Rptr.2d 765]—involves a UCL claim premised on a practice of charging pre-closing interest in a manner that allegedly violates Civil Code section 2948.5. (*Washington Mutual,* at p. 610.) The Second District held that the claim was preempted by section 560.2(b)(4) because interest is a term of credit. (*Washington Mutual,* at p. 621.) That holding has no application here, however, because the predicate duty that those borrowers were suing to enforce—to comply with the statutory limits on the accrual of interest—was precisely the type of state-law "requirement" that is specifically preempted by section 560.2, i.e., one that is specifically intended to regulate lending. It bears no similarity to the claims here, which seek to enforce contract and commercial laws of general application.

Similarly, in *Chaires v. Chevy Chase Bank* (2000) 131 Md.App. 64 [748 A.2d 34], borrowers alleged that a federal savings association had committed unfair and deceptive business practices by charging loan fees that were excessive under Maryland's Secondary Mortgage Loan-Credit Provisions Law. (*Chaires, supra,* 748 A.2d at pp. 36-37.) The Court of Special Appeals of Maryland correctly held that those claims were preempted by section 560.2(b)(5), concerning initial charges and other loan-related fees, and by section 560.2(b)(4), regarding terms of credit. (*Chaires, supra,* 748 A.2d at pp. 42-47.) But as in *Washington Mutual Bank v. Superior Court, supra,* 95 Cal.App.4th 606, those borrowers were seeking to enforce a predicate duty that relates solely to lending, not to business activities generally. Accordingly, it falls squarely within the type of state-law "requirement" that is specifically preempted by section 560.2.

In the third example, *Albank, FSB v. Foland* (1998) 177 Misc.2d 569 [676 N.Y.S.2d 461], the borrower claimed that a bank had violated New

York's Personal Property Law regarding the disclosures that must be made as part of an open-ended credit agreement. (676 N.Y.S.2d at p. 463.) A New York trial court found that the statutory regulations were preempted. (*Id.* at pp. 463-464.) The predicate duty at issue there—to make the disclosures prescribed by New York statutes—is specifically preempted by section 560.2(b)(9), which refers to state law requirements regarding "[d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents . . . ."

Here, by contrast, the plaintiffs claim that statements made were improper, not because they violated statutory restrictions regarding lending activities or because they were otherwise insufficient, but because they were false. The general duty to refrain from making affirmative misrepresentations is not one of the requirements or prohibitions preempted by section 560.2, any more than it is by section 545.2. Therefore, what was true in *Fenning v. Glenfed, Inc.*, is true here: State law "cannot dictate to the Bank how it can or cannot operate, but it can insist that, however the Bank chooses to operate, it do so free from fraud and other deceptive business practices." (*Fenning v. Glenfed, Inc., supra*, 40 Cal.App.4th at p. 1299.)

World also relies upon an opinion letter issued by the OTS. In 1999, the general counsel of the OTS rendered an opinion as to whether particular claims under the UCL were preempted by section 560.2. (Off. of Thrift Supervision, general counsel opn. Mar. 10, 1999, Fed. Banking L. Rep. (CCH) ¶ 83-301, pp. 94,201 to 94,209; OTS Opinion.) Among the claims considered was a complaint "alleging that during the course of force placing hazard insurance on behalf of its borrowers, as a result of the borrowers' failure to pay the insurance premiums under their existing policies, Association A did not mitigate avoidable costs that were then passed on to the borrowers. Specifically, the complaint alleges that when the borrowers' hazard insurance coverages expired, Association A force placed alternative coverage from a different insurance company at a higher cost than the cost of the lapsed policy. The plaintiffs contend that Association A had an obligation to mitigate avoidable losses by maintaining the same policy in effect with the same insurance carrier at the same price (or even less). The plaintiffs allege that Association A's procedures for force placing hazard insurance constitute an 'unfair business practice' in violation of § 17203 of the [UCL]." (*Id.* at pp. 94,204 to 94,205, fns. omitted.)

Noting that section 560.2(b)(2) preempts state laws regarding the ability of a federal savings association to require insurance for its collateral, the

OTS stated that the forced-placed insurance claim described in the opinion was preempted, reasoning that "lending practices designed to protect the collateral that serves as security for a loan are an integral part of a federal savings association's lending operations. Accordingly, to the extent that the [UCL] is being used either to limit the Associations' ability to force place insurance on properties securing loans, or the Associations' choice of insurers or premiums to be charged on the forced placement of insurance, the [UCL] is preempted as an impermissible interference with the Associations' lending programs." (OTS Opn., *supra*, p. 94,208, fns. omitted.)

That conclusion does not apply here. OTS expressly limited its opinion to the factual and procedural circumstances posed by the party that had requested the opinion. It warned that "[a]ny material differences in facts or circumstances from those described [in the opinion] could result in different conclusions." (OTS Opn., *supra*, p. 94,209.) The claim described in the OTS Opinion is materially different from the claim asserted in the trial here.

The claim in the OTS Opinion is simply that the lender had chosen to purchase insurance from an insurer with higher rates than the borrower's insurer. But here the claim is that the premium charged to the borrower for FOI was not only higher than the premium for the borrower's policy would have been, but was higher because it represented the cost, not only of insurance, but of a bundle of other services being provided to World by the insurer, and that World lied to conceal that fact. In other words, the plaintiffs claim that, under the guise of charging them for hazard insurance, World actually charged them for something else—some other type of insurance product—for which they were not contractually obligated to pay.

Even were the two claims not materially different, we would question the OTS's conclusion. While it is true that section 560.2(b)(2) preempts state laws imposing requirements regarding the ability of savings associations to require or obtain insurance on loan collateral, it does not follow those lenders are free to charge whatever they wish for the insurance they purchase. While state law cannot prescribe limits on the premiums to be charged, the parties can agree to contractual terms that place certain restrictions on those premiums. And if the parties have done so, the courts of this state can interpret and enforce those contractual limitations without impinging upon the preempted field of regulation.

In summary, as the OTS itself emphasized in the very opinion on which World relies, section 560.2 does "not preempt the entire [UCL] or its general application to federal savings associations in a manner that only incidentally affects lending . . . ." (OTS Opn., *supra*, p. 94,209.) Resolution of the UCL

claim here involves state laws of general application that affect lending only incidentally. Therefore, the trial court erred by concluding that the plaintiffs' claims were federally preempted.

B. *World's Alternative Bases for Affirming the Judgment Also Fail.**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed. The plaintiffs' request for judicial notice filed May 1, 2000, is granted as to those documents attached as exhibit K but denied as to exhibits A through J. The plaintiffs shall recover their costs on appeal.

Ward J., and Gaut, J., concurred.

On December 24, 2002, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 19, 2003.

---

*See footnote, *ante*, page 1291.