[No. B160853. Second Dist., Div. One. July 29, 2003.]

PAULA M. HUSSEY-HEAD, Plaintiff and Appellant, v.
WORLD SAVINGS AND LOAN ASSOCIATION, Defendant and
Respondent.

774

## COUNSEL

Ives & Associates, Robert N. Ives; Greines, Martin, Stein & Richland, Barbara W. Ravitz and Laura Boudreau for Plaintiff and Appellant.

Musick, Peeler & Garrett, Barry D. Hovis, Cheryl A. Orr; Kester & Quinlan and Steven L. Kester for Defendant and Respondent.

## OPINION

**VOGEL (MIRIAM A.), J.**—A consumer sued her lender, claiming it had furnished incomplete and inaccurate information to several credit reporting agencies. The trial court granted the lender's motion for summary judgment, and the consumer appeals. We agree with the consumer that there are triable issues of material fact, reject the lender's federal preemption claims, and reverse the judgment.

### FACTS

#### A.

In 1992, Paula M. Hussey-Head (and her husband, David A. Head, who is not a party to this appeal) purchased a house on Sorrel Lane in Rolling Hills Estates. Hussey-Head borrowed about $540,000 from World Savings and Loan Association, signed a note, and secured the loan with a deed of trust on the Sorrel Lane property. In December 1995, Hussey-Head sold the property to Louie and Frances Dileva. With World Savings' consent, the Dilevas assumed Hussey-Head's loan obligations, and World Savings released Hussey-Head from all liability under the note and deed of trust.

In 1997, the Dilevas started having financial problems and did not make all of their loan payments. Around the same time, Hussey-Head started having problems with various credit reporting agencies, all of which issued reports suggesting Hussey-Head was delinquent in her payments to World Savings on the loan assumed by the Dilevas. In 1999, the Dilevas defaulted, and the trustee recorded a notice of default and election to sell under the deed of trust. Hussey-Head repeatedly contacted World Savings to request correction of the errors, to no avail.

## B.

World Savings provides monthly consumer credit reports to the three major credit reporting agencies (Equifax, Experian, and Trans Union) pursuant to contractual subscriber agreements. To do this, World Savings produces four sets of identical digital tapes by means of automated "sweeps" of its customer service files, thereby picking up its customers' complete credit histories. According to Experian's Compliance Manager, David Browne, the tapes must be formatted and encoded pursuant to certain protocols, without which the credit reporting agencies cannot properly read the tapes (and it is the lenders' responsibility to see that the tapes are properly formatted). According to Browne, World Savings should have used an "H" code to show that Hussey-Head's loan had been assumed by another party, and—in order to cut "the umbilical cord between the original borrowers ... and the new people"— World Savings should have used a "T" code to show that Hussey-Head's loan had been closed or terminated, and made it clear that Hussey-Head had a "$0" loan balance.

## C.

In July 2000, Hussey-Head sued World Savings, and in her first amended complaint alleged a claim under the California Consumer Credit Reporting Agencies Act, Civil Code section 1785.1 et seq.[1] She alleged the facts summarized in part A, *ante*, and also alleged that World Savings had repeatedly "furnished false, inaccurate and misleading information to consumer credit reporting agencies," that she had repeatedly asked World Savings to correct the problem but nothing had been done and that, knowing the information was wrong, World Savings had continued to provide it to the credit reporting agencies. As a result of World Savings' false reports, Hussey-Head's credit rating was adversely affected and her applications for credit to lease an automobile and to obtain a new VISA card were denied, all of which caused her personal embarrassment and humiliation. World Savings answered and discovery ensued.

## D.

In August 2001, World Savings moved for summary judgment, and in support of its motion submitted a two-paragraph declaration from Linda

---

[1] Subsequent undesignated section references are to the Civil Code. The purpose of the Act is "to require that consumer credit reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, hiring of a dwelling unit, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this title." (§ 1785.1, subd. (d).)

Myers, the assistant vice-president and department manager of World Savings' business operations section and the person with "the overall responsibility for overseeing World Savings' reporting of consumer credit information to the three major credit bureaus, Trans Union, Experian and Equifax ...." She stated:

"World Savings only reports consumer credit information to the three Major Credit Bureaus. World Savings has never had a reporting relationship with Standfacts Credit Services and did not report or furnish any credit information about [Hussey-Head] to Standfacts Credit Services. After reviewing World Savings' files on [Hussey-Head], it is clear that World Savings did not report any incomplete or inaccurate consumer credit information concerning [Hussey-Head] to the Major Credit Bureaus. Additionally, World Savings did not issue the Notice of Default on [the Sorrel Lane] loan, nor did it furnish that information to any credit reporting agency. The issuance of the Notice of Default is the exclusive responsibility of the Trustee, which in this case was Golden West Savings Association Service Co. Notices of Default are only recorded as a public record with the county recorder's office and sent to those persons entitled to receive them by law by the Trustee, not World Savings. Notices of Default are not in any way furnished to credit reporting agencies.

"Based on my review of, understanding, experience and knowledge of the credit reporting industry and World Savings' procedures regarding credit reporting, it does not appear that World Savings was the source of any adverse credit information concerning [Hussey-Head] which apparently shows up on some of [her] credit reports."

E.

In opposition to World Savings' motion, Hussey-Head presented evidence of the credit reports issued by Experian, Equifax, and Standfacts—which showed they *had* received inaccurate information from World Savings.

A September 1997 report from Experian describes the Sorrel Lane loan as a "joint account" that Hussey-Head was obligated to repay and which was "past due." A February 1999 report on Hussey-Head's creditworthiness from Western Data Research describes the Sorrel Lane loan as "delinquent." An April 1999 report from Experian shows "World Savings & Loan" as the source of information that "foreclosure was started" on the Sorrel Lane loan, and that Hussey-Head remained liable on that loan ("Joint with Louie Dileva"). A February 2000 report on Hussey-Head's creditworthiness from Standfacts Credit Services lists World Savings in a section captioned "open

derogatory items." An April 2000 report from Equifax states that Hussey-Head was "1 time 30 days late" on the Sorrel Lane loan, and that this item was disputed by the consumer because "account assumed by another party."[2]

Hussey-Head contended the negative credit information supported a reasonable inference that, notwithstanding Myers's declaration to the contrary, World Savings had furnished false information to the credit reporting agencies—thus creating a triable issue of material fact, or as Hussey-Head put it, "Even if there were not direct documentary evidence that World Savings was the source of the information the only reasonable inference, based on the fact that the information was confidential and not public, is that the source was ... World Savings."[3]

## F.

In its reply, World Savings presented a supplemental declaration from Myers in which she explained that World Savings "sweeps" loan information on the 25th of each month. On January 19, 1996, World Savings changed the borrowers' names and social security numbers in its computer system to reflect the Dilevas' assumption of the Sorrel Lane loan. For reasons that are not clear from Myers's declaration, the January "sweep" nevertheless reported Hussey-Head "as associated with" the Sorrel Lane loan, and the Dilevas were first shown as the borrowers on the February 25, 1996, sweep. World Savings' records (to the extent they still exist) show the Dilevas' first delinquency occurred in July 1997, and World Savings' report to the credit reporting agencies reflected the Dilevas as the delinquent borrowers, not Hussey-Head. According to Myers, no negative reports were issued about Hussey-Head.

## G.

According to Hussey-Head's evidence, the problem arose out of a coding error on January 19, 1996—when World Savings generated an "H" code to show the assumption which, by itself, was insufficient to prevent future

---

[2] Although there were some minor discrepancies between Hussey-Head's copies of the credit reports and Experian's records, those discrepancies do not affect the substance of this appeal.

[3] Some of Hussey-Head's evidence was submitted after the hearing on World Savings' motion was continued at her request, and several more continuances separated the submissions summarized below. But all the evidence discussed in the text was before the trial court when it ruled on the summary judgment motion—and World Savings is simply mistaken when it claims that some of Hussey-Head's evidence was first presented to the trial court on a later motion for reconsideration. Although Hussey-Head's expert (Browne) submitted a more detailed declaration with her motion for reconsideration, that declaration did no more than reiterate the expert's deposition testimony, and that testimony was already before the court.

reporting on Hussey-Head's credit reports. World Savings failed to use the required "T" code to show the loan was closed. Later (at some point before August 1998), World Savings' report to Experian added a "B" code (terminating a joint account relationship) and an "H" code with regard to Hussey-Head's husband—but not as to Hussey-Head. In April 1999, World Savings prepared a form intended to advise the credit reporting agencies that the status of Hussey-Head's loan should be changed from adverse to favorable because the loan had been assumed by the Dilevas, but again failed to use the required "T" code. As of September 1999, Experian's records showed Hussey-Head jointly liable with the Dilevas; it was not until April 2000 that World Savings told Trans Union to correct its records, and not until May 2000 that World Savings told Equifax to correct its records. *This evidence is uncontroverted.*

### H.

The trial court granted World Savings' motion for summary judgment on the ground that "[t]he declaration of Linda Myers establishes that the Notice of Default was not furnished by World Savings or [the trustee] to any consumer credit reporting agencies. Without such publication,... sections 1785.25 and 1785.26 have not been violated." Although Hussey-Head conceded this point and argued that World Savings had issued incorrect information in its credit reports (or that, at a minimum, there were triable issues of fact on that point), the trial court disregarded all the other evidence summarized above. Hussey-Head's motion for reconsideration was denied, and she now appeals from the judgment.

### DISCUSSION

### I.

We agree with Hussey-Head's contention that the trial court erred in concluding there were no triable issues of material fact.[4]

The California Consumer Credit Reporting Agencies Act prohibits a person from "furnish[ing] information on a specific transaction or experience to any

---

[4] From the minute order granting World Savings' motion for summary judgment, it is clear that the trial court severely restricted its examination of the issues framed by Hussey-Head's complaint and her opposition to the motion. Hussey-Head's predominant claim—that World Savings had furnished false loan account information to the credit reporting agencies—was ignored, and the trial court's ruling is based entirely on an issue abandoned by Hussey-Head (the notice of default) long before the motion was fully briefed. In so limiting the basis for its ruling, the trial court failed to consider most of the issues raised by World Savings' motion and Hussey-Head's opposition. Our review is not limited by the trial court's error. (*Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450 [75 Cal.Rptr.2d 54].)

consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." (§ 1785.25, subd. (a).) In addition, a "creditor may submit negative credit information concerning a consumer to a consumer credit reporting agency only if the creditor notifies the consumer affected ...." (§ 1785.26, subd. (b).) ■ Violations of these statutes support a civil action for damages and other relief. (§ 1785.31 et seq.) Hussey-Head sued under these statutes, alleging that World Savings had furnished false, negative, disparaging, and misleading financial information to consumer credit reporting agencies. Hence, the question before the trial court was whether there was a triable issue of material fact concerning Hussey-Head's claim that World Savings violated sections 1785.25, subdivision (a), and 1785.26, subdivision (b). (Code Civ. Proc., § 437c.)

■ Viewed in the light most favorable to Hussey-Head (*Saelzler v. Advanced Group* 400 (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]), the record shows there are triable issues of material fact concerning the manner in which World Savings disseminated information to the credit reporting agencies. Hussey-Head's expert testified that World Savings did not conform to the standards accepted in the industry, and World Savings did not show otherwise. That testimony and the undisputed existence of the erroneous information received by the credit reporting agencies create a reasonable inference that World Savings failed to do what it was supposed to do—and it is immaterial that World Savings' direct evidence shows otherwise. ■ Circumstantial evidence is just as good as direct evidence to create a triable issue of fact. (*Id.* at p. 767 [to prevail by summary judgment, the moving party must establish that " 'under no hypothesis is there a material issue of fact that requires the process of trial' "].)[5]

## II.

After World Savings moved for summary judgment but before the motion was heard, the trial court permitted World Savings (a federal savings and loan association) to amend its answer to add an affirmative defense of preemption, and further briefs were thereafter filed. On this appeal, World Savings contends that, assuming the existence of triable issues of material fact, the judgment should nevertheless be affirmed on preemption grounds. More

---

[5] We reject World Savings' suggestion that Hussey-Head was required to do more than she did to establish a reasonable probability that World Savings was the cause of her injuries. Her showing was sufficient to create triable issues of material fact, and was not (as World Savings suggests) based on pure speculation or surmise. For this reason, World Savings' reliance on our decision in *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472 [50 Cal.Rptr.2d 785] is misplaced. We similarly reject World Savings' suggestion that Hussey-Head's complaint was somehow limited to a claim arising out of the Notice of Default. To the contrary, the complaint charged World Savings with multiple reporting errors and it was in no way limited to the one document.

specifically, World Savings contends Hussey-Head's claims are preempted by 12 Code of Federal Regulations part 560.2 (2003) (Regulation 560.2), a regulation promulgated by the Office of Thrift Supervision (OTS) pursuant to its rulemaking authority under the Home Owners' Loan Act of 1933 (12 U.S.C § 1461 et seq.). We disagree.

## A.

Regulation 560.2(a) authorizes the OTS to promulgate regulations "that preempt state laws *affecting the operations of federal savings associations*" and provides that, in order to enhance the safety and soundness of federal savings associations, OTS "occupies the entire field of *lending regulation* for federal savings associations." (Boldface and italics added.) As "[i]llustrative examples" of the "types of state laws preempted," Regulation 560.2(b) lists laws "purporting to impose requirements" regarding "[a]ccess to and use of credit reports," disclosure and advertising laws, and processing, origination, servicing, sale, purchase of, or participation in, mortgages. On the other hand, Regulation 560.2(c) provides that certain types of state laws are "not preempted"—including those that only incidentally affect the lending operations of federal savings associations or are otherwise consistent with the regulation. (For a complete discussion of Regulation 560.2, see *Lopez v. World Savings & Loan Assn.* (2003) 105 Cal.App.4th 729, 737–742 [130 Cal.Rptr.2d 42].)

## B.

The Home Owners' Loan Act was enacted to regulate federal savings and loan associations through the OTS's predecessor, the Federal Home Loan Bank Board, "so as to ensure their vitality as 'permanent associations to promote the thrift of the people in a cooperative manner, to finance their homes and the homes of their neighbors.' " (*Fidelity Federal Sav. & Loan Ass'n v. De La Cuesta* (1982) 458 U.S. 141, 160 [73 L.Ed.2d 664, 102 S.Ct. 3014].) To that end, Congress delegated broad power to the OTS—but did not "permit [OTS] to pre-empt the application of all state and local laws to such institutions. Nothing in the language of [the Home Owners' Loan Act] remotely suggests that Congress intended to permit [OTS] to displace local laws ... not directly related to savings and loan practices." (*Id.* at p. 172 (conc. opn. of O'Connor, J.).)

Based on the language of Regulation 560.2 and the language used by the United States Supreme Court, it is hardly surprising that California's courts have rejected preemption attacks by federal savings associations aimed at a statute regulating the collection of reconveyance fees (*Siegel v. American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953 [258 Cal.Rptr. 746]), an

unfair business practice claim based on a federal savings association's ownership of slum dwellings (*People ex rel. Sepulveda v. Highland Fed. Savings & Loan* (1993) 14 Cal.App.4th 1692 [19 Cal.Rptr.2d 555]), and an unfair business practice claim against a federal savings association based on its relationship to a brokerage subsidiary (*Fenning v. Glenfed, Inc.* (1995) 40 Cal.App.4th 1285 [47 Cal.Rptr.2d 715]).

■ It follows that sections 1785.25 and 1785.26 may be enforced against a federal savings association. These statutes are not "lending regulations" and they do not purport to govern the manner in which World Savings or any federal savings association runs its business. They do no more than recognize the fact that creditors *voluntarily* report credit information to credit reporting agencies and others, and the purpose of the California Consumer Credit Reporting Agencies Act is to ensure that the information thus reported is fair and accurate. (§ 1785.1, subds. (d), (e).) The California statutory scheme does not come into play until after a loan is made or credit otherwise extended, and it does not affect the manner in which the lender services or maintains the loan; as a result, the California statutes are not inconsistent with the federal Home Owners' Loan Act.

To paraphrase *Gibson v. World Savings & Loan Assn.* (2002) 103 Cal.App.4th 1291, 1302 [128 Cal.Rptr.2d 19], where the court held that the OTS did not preempt an action under our unfair competition statute (Bus. & Prof. Code, § 17200 et seq.), "[a] stated intent to preempt requirements or prohibitions imposed by state law does not reasonably extend to those *voluntarily assumed* [by contract]." (Boldface and italics added.) In *Gibson* as in our case, the statutes on their face do "not purport to regulate federal savings associations and are not specifically directed toward them. Nor is there any evidence that they were designed to regulate federal savings associations more than any other type of business, or that in practice they have a disproportionate impact on lending institutions. Any effect they have on the lending activities of a federal savings association is incidental rather than material." (*Gibson v. World Savings & Loan Assn., supra,* 103 Cal.App.4th at p. 1302.)[6]

---

[6] Because World Savings acts voluntarily when it disseminates information to credit reporting agencies, its reliance on *Lopez v. World Savings & Loan Assn., supra,* 105 Cal.App.4th 729, is misplaced. In *Lopez,* the plaintiff challenged World Savings' practice of charging a $10 fee for the transmission of a payoff demand statement by fax, over and above the statutorily authorized fee for such services. (§ 2943, subd. (e)(6).) *Lopez* deals with loan-related fees, which are plainly preempted by Regulation 560.2(b)(5), and we do not disagree with the conclusion reached in *Lopez*—but our case does not deal with loan-related fees. The other case relied on by World Savings, *Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606 [115 Cal.Rptr.2d 765], is inapposite for the same reason (that is, that preclosing interest charges are loan-related fees and, as such, preempted). ■ And whatever merit there may be to the suggestion in *Washington Mutual Bank* that *Siegel v.*

For these reasons, we reject World Savings' contention that it is exempt from all state regulation without regard to whether the regulation affects its lending decisions or affects a necessary step in the lending process. (*Lopez v. World Savings & Loan Assn., supra*, 105 Cal.App.4th at p. 739 [a lender's payoff demand statement is not subject to state regulation because it "is a necessary step in paying off the loan"].) Since sections 1785.25 and 1785.26 apply to World Savings because it voluntarily provides credit information about its borrowers to third parties, the statutes plainly do not affect World Savings' lending activities and they are not preempted by OTS. (*Fenning v. Glenfed, Inc., supra*, 40 Cal.App.4th at p. 1299 [although California cannot dictate to a federal savings association how it can or cannot operate, "it can insist that, however [the association] chooses to operate, it do so free from fraud and other deceptive business practices"]; and see *Thomka v. Financial Corp.* (1993) 15 Cal.App.4th 877, 885–887 [19 Cal.Rptr.2d 382] [employment claims not preempted].)[7]

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to place the case back on track for trial. Hussey-Head is awarded her costs of appeal.

Spencer, P. J., and Ortega, J., concurred.

On August 27, 2003, the opinion was modified to read as printed above.

---

*American Savings & Loan Assn., supra*, 210 Cal.App.3d 953, was wrongly decided (because a reconveyance fee appears to be a loan-related fee), we believe *Siegel* supports our conclusion that California may validly restrict the manner in which a federal savings association disseminates information it has voluntarily provided to credit reporting agencies.

[7] We summarily reject World Savings' alternative contention, raised for the first time on this appeal, that Hussey-Head's claims are preempted by the federal Fair Credit Reporting Act (15 U.S.C. § 1681s–2). With regard to this appeal, the issue was waived by World Savings' failure to raise it below (*366–388 Geary St., L.P. v. Superior Court* (1990) 219 Cal.App.3d 1186, 1199 [268 Cal.Rptr. 678]). Moreover, the issue appears to raise questions of fact that, at a minimum, might prompt Hussey-Head to seek leave to amend and might, in addition, be incapable of resolution by summary judgment. To the extent we have discretion to review this issue, we decline to do so. (*Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2002) ¶ 8:240.1, p. 8–117.)