## In re WASHINGTON MUTUAL OVERDRAFT PROTECTION LITIGATION,

**This action relates to: All Actions.**

**Case No. CV 03–2566 ABC (RCx).**

United States District Court,
C.D. California.

March 17, 2008.

---

Andrew Kierstead, Andrew S. Kierstead Law Offices, Portland, OR, Barry J. MacNaughton, Kelly O. Scott, Ervin Cohen and Jessup, Beverly Hills, CA, Charles M. Delbaum, National Consumer Law Center, Boston, MA, David A. Searles, Michael D. Donovan, Donovan Searles, Philadelphia, PA, for Chirou M. Sola.

Chi Chi Wu, Stuart T. Rossman, National Consumer Law Center, Boston, MA, Marc R. Stanley, Martin Woodward, Roger L. Mandel, Stanley Mandel and Iola, Dallas, TX, Matthew J. Zevin, Stanley Mandel and Iola, San Diego, CA, for Chirou M. Sola and Nadine Viseth.

David W. Moon, Julia B. Strickland, Keith A. Custis, Lisa M. Simonetti, Stroock Stroock & Lavan, Los Angeles, CA, for Washington Mutual Bank FA.

## ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND TO DISMISS

AUDREY B. COLLINS, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment, and to Dismiss ("Motion"), filed on December 6, 2007. Plaintiffs filed an Opposition on January 4, 2008, and Defendant filed a Reply on January 22, 2008. Defendant filed two Notices of Recent Decision, on January 25 and February 11, 2008, to which Plaintiffs filed a Response and objection on February 19, 2008. Defendant filed a Notice of Errata on March 13, 2008. The Court finds this Motion appropriate for decision without oral argument and **VACATES** the hearing set for April 14, 2008. *See* Fed.R.Civ.P. 78; Local Rule 7–

15. Having considered the materials submitted by the parties and the case file, the Court hereby **GRANTS** Defendant's Motion.

## I. PROCEDURAL HISTORY

On October 20, 2003, Plaintiffs filed a Consolidated Class Action Complaint ("Complaint") against Defendant Washington Mutual Bank, FA ("Washington Mutual"), alleging violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, and its implementing regulations 12 C.F.R. Pt. 226 ("Regulation Z") ("TILA claims"); the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461, *et seq.*; and various Washington and California state laws, in connection with the "Overdraft Limit feature" of ATM and debit cards ("ATM cards") that Defendant issued to Plaintiffs.

In November 2003, Defendant moved to dismiss the Complaint. In an Order issued April 26, 2004, 2004 WL 5046210 ("April 26 Order"), the Court found that none of Plaintiffs' causes of action stated a claim for relief and dismissed the case. In relevant part, this Court dismissed certain of Plaintiffs' TILA claims on the ground that "Plaintiffs failed to sufficiently allege that the parties agreed in writing to payment of the items creating the overdraft," and that therefore the cards were not credit cards to which TILA or 12 C.F.R. § 226.12 applied. (Order 6:4–7.) Relatedly, the Court held that Plaintiffs' allegation that Defendant's promotional materials constituted a contract was inadequate to show that Defendant had agreed to pay all overdraft items because "promotional materials are not agreements." (Order 7:1–7.) Having dismissed all of the federal claims, the Court dismissed without prejudice the supplemental state claims.

Plaintiffs appealed. *See Sola v. Wash. Mut. Bank FA (In re Wash. Mut. Overdraft Prot. Litig.)*, 201 Fed.Appx. 409 (9th Cir.2006) The Ninth Circuit affirmed, reversed, and remanded in part the April 26 Order. Specifically, the Ninth Circuit reversed the dismissal of Plaintiffs' claims under "TILA and 12 C.F.R, § 226.12, for unsolicited issuance of credit cards and offsetting without an agreement to do so," stating that "the complaint does not necessarily imply the existence of a formal, written deposit agreement. Read in the light most favorable to the plaintiffs, it alleges that a credit agreement governing the ATM cards exists based on the promotional materials and the parties' courses of conduct. As alleged in the complaint, then, the cards may fall within the definition of credit cards." (201 Fed.Appx. at 410.) However, the Court also noted that "if the defendants introduce evidence of a written deposit agreement with terms contrary to the promotional materials, the cards may well not satisfy the definition of credit cards. In that case, the district court's reasoning may apply." (*Id.* at 410, fn. 4.) Because the Ninth Circuit reinstated the two TILA claims, it noted that this Court should reconsider its decision to decline supplemental jurisdiction over the state claims.

Thereafter, Plaintiffs filed their Corrected Second Amended Consolidated Class Action Complaint ("SAC") realleging in their First Cause of Action the two revived federal claims. Specifically, Plaintiffs claim that by "issuing ATM cards and debit cards to Plaintiffs and the Class in connection with its 'Overdraft Protection–Overdraft Limit' feature, [Defendant] violated TILA's provisions against the unsolicited issuance of credit cards, 15 U.S.C. § 1642, because these ATM cards and debit cards were credit cards as defined by TILA and Regulation Z, 12 C.F.R. § 226.2(a)(15)." (SAC ¶ 30.) Second, Plaintiffs claim that "by offsetting the accounts of Plaintiffs and the Class in connection with ATM card and debit card

transactions made pursuant to its 'Overdraft Protection–Overdraft Limit' credit feature, [Defendant] violated TILA's prohibition against credit card issuers offsetting cardholders' indebtedness against funds held on deposit with card issuers in the absence of the affirmative consent of Plaintiffs and the Class, pursuant to 15 U.S.C. § 1666h(a)." (SAC ¶ 31.) Plaintiffs also reallege three claims under California law: their Second Cause of Action for violation of California Business & Professions Code § 17200, *et seq.*; their Third Cause of Action for violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750 *et seq.*; and their Fourth Cause of Action for unjust enrichment under California law.

On December 12, 2006, the Court approved the parties' Stipulation and Order, pursuant to which discovery was stayed in anticipation of Defendant's filing a Rule 12(b)(6) motion to dismiss the SAC. On January 19, 2007, Defendant filed its 12(b)(6) motion asking the Court to dismiss each of Plaintiffs' four causes of action. Defendant's motion included exhibits purporting to be the Master Agreement and Account Disclosures that set forth all of the relevant terms governing the Plaintiffs' accounts. Defendant stated that, in submitting these materials, it essentially renewed its November 2003 motion to dismiss the revived TILA claims by supplying the Court with the governing agreements that the Ninth Circuit noted were missing from the record when this Court issued its April 26 Order.

Plaintiffs then moved to lift the stay of discovery, noting that Defendant's motion to dismiss asked the Court to consider matters outside of the pleadings, and challenging whether the documents submitted by Defendant constituted the entirety of the agreement between the parties. Plaintiffs thus asked the Court to convert the Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment, and, pursuant to Rule 56(f), to continue the motion to allow Plaintiffs to take discovery sufficient to respond to Defendant's motion. Therein, and in subsequent briefing, Plaintiffs elaborated on their two theories purporting to trigger liability under TILA. First, under their "credit agreement theory," Plaintiffs contend that Defendant's promotional brochure created a credit agreement triggering TILA. Second, under their "credit feature theory," Plaintiffs contend that Defendant's automatic payment of overdrafts renders the Overdraft Limit feature a credit feature triggering TILA. In its April 18, 2007 minute order, the Court lifted the stay to allow Plaintiff to conduct discovery as to the entirety of the written agreement between the parties so that the Court could ascertain the terms of that agreement.

Thereafter, Defendant filed the instant motion, seeking summary judgment on Plaintiffs' first cause of action (its TILA claims) and dismissal of Plaintiffs' state law claims.

## II. FACTUAL BACKGROUND

The parties are in substantial agreement about almost all of the material facts. Defendant is a federal savings association. (Defendant's Statement of Uncontroverted Facts Number ("UF") 1.) Plaintiffs opened checking accounts with Defendant (UF 3–5), and each Plaintiff signed a "Master Agreement" acknowledging that he or she is bound by the agreement and all of Defendants' disclosures and regulations, and acknowledging receipt of Defendant's Account Disclosures and Regulations ("Account Disclosures"). (UF 6–8.) The Account Disclosures included an "Overdraft Limit Provision" ("Overdraft Limit") as follows: "If your periodic statement for your account specifies an 'Overdraft Limit,' the Bank may, at its option, pay checks,

transfers and withdrawals presented for payment against your account, despite insufficiency of good funds in the account, up to the amount of the Overdraft Limit, but has no obligation to do so. Fees will be assessed as set forth above. The Bank provides this Overdraft Limit at its sole option. We may terminate or reduce the Overdraft Limit at any time without limit, and without notice except as when required by law." (UF 10.)[1] The Overdraft Limit Provision in subsequent revisions of the Account Disclosures also provides that Defendant is not obligated to pay overdrafts and may terminate or reduce the Overdraft Limit at any time. (UF 11.) Defendant imposed a fee on Plaintiffs for each overdraft it paid under Overdraft Limit.

The "promotional materials" attached to Plaintiffs' complaint are from an informational brochure entitled "Checking Savings & Services" (the "CS & S Brochure"). (UF 12.) The CS & S Brochure is a color brochure of approximately twelve pages highlighting various aspects of Defendant's accounts and services. (UF 13.) The CS & S Brochure was replaced by a March 2001 version, which did not reference Overdraft Limit. (UF 14.) Defendant has never used the CS & S Brochure, or any other brochures, to announce amendments to the Account Disclosures. (UF 15.) Defendant provides notice of amendments to the Account Disclosures where required by providing customers with a formal Notice of Change specifying, among other things, the precise change, the accounts to which the change applies, and the effective date of the change. (UF 16.) The Overdraft

Limit Provision has never been the subject of a Notice of Change. (UF 17.) It is also undisputed that the Account Disclosures have always provided that: (1) payment of transactions under Overdraft Limit is discretionary; (2) Overdraft Limit is provided at Defendant's sole option; and (3) Overdraft Limit may be terminated or reduced at any time. (UF 18.)

Plaintiffs attempt to dispute this final fact. They argue that language in the Account Disclosures incorporates the CS & S Brochure as part of the parties' agreement, and that the CS & S Brochure in turn obliges Defendant, as a matter of contract, to pay overdrafts. The relevant incorporating language in the Account Disclosures states: "all other documents we provide or require you to sign in connection with accounts and services (including without limit the STATEMENT OF FEES applicable to your account and the Bank Rate Information Sheet), are a part of your Master Account Agreement and incorporated therein by reference." (Pls' Response to UF 18.) The CS & S Brochure in turn states "Overdraft Protection:" "Don't worry, we'll cover you. We have three options available: Overdraft Limit—Automatic protection provided to all new checking account. Up to your limit, we'll pay your checks—saving you time, money and embarrassment." (*Id.*)

For the reasons set forth below, the Court finds that the CS & S Brochure does not constitute a contract or add terms to the Master Agreement. Accordingly, uncontroverted fact 18 is not genuinely disputed. These two findings in turn com-

---

1. Facts 10 and 11, among others, are drawn from Account Disclosures attached as Exhibit F to the Declaration of Stacy Lynch, filed December 6, 2007. On March 13, 2008, Defendant filed a Notice of Errata explaining that it had inadvertently filed the wrong document as Exhibit F, and attached therewith as Exhibit A the correct version of the Account

Disclosures. (Lynch Decl. 3/13/2008, Exh. A.) The Court notes the correction for the record. However, the operative language is present—and identical—in both documents. Accordingly, because there is no material difference in the documents as they relate to this case, Defendant's error is harmless.

pel the conclusion that TILA and Regulation Z do not apply to Overdraft Limit.

## III. DISCUSSION

### A. Motion for Summary Judgment on Plaintiffs' Truth in Lending Act Claims.

The Truth in Lending Act was enacted to promote "the informed use of credit" by consumers. 15 U.S.C. § 1601. To this end, TILA requires "creditors" to make disclosures about the cost of credit to consumers in a uniform manner. Plaintiffs assert that Defendant violated TILA's prohibitions against the unsolicited issuance of credit cards and the offsetting of a credit card account. Thus, as both parties recognize, neither of Plaintiffs' two TILA claims can survive unless the ATM cards constitute "credit cards," thereby requiring Defendant, as a "creditor," to make certain disclosures concerning the cards. Plaintiffs argue that under either their "credit agreement theory" or their "credit feature theory," the ATM cards are effectively "credit cards" pursuant to TILA because, under the circumstances, the Overdraft Limit feature that the ATM cards access is a "credit" feature. Defendant argues that Overdraft Limit is not a credit feature, and that therefore TILA does not apply to the ATM cards.

### 1. Legal Standard for a Motion for Summary Judgment.

■ Summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ If, as here, the non-moving party has the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading ... [Rather,] the adverse party's response ... must set forth *specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added).

■ A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements of that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

 "[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir.1992). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "On the other hand, the movant's uncontradicted factual allegations ordinarily are accepted." *John v. City of El Monte*, 505 F.3d 907, 912 (9th Cir.2007). Furthermore, the court must view the evidence presented "through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505.

## 2. The Federal Reserve Board's Positions.

 While this matter was on appeal, the Ninth Circuit invited the Board of Governors of the Federal Reserve System (the "Board") to file an amicus brief addressing two issues: whether overdraft protection programs are subject to TILA, and the degree of deference to which the Board's interpretations of TILA are entitled. The Board's amicus brief ("Board's brief") addressing these questions is attached as Exhibit B to Defendant's Request for Judicial Notice ("RJN Exh. B"). The Court hereby takes judicial notice of the Board's brief.

### a. The Board's Interpretations of TILA and Regulation Z Are Entitled to a High Degree of Deference.

 As discussed in the Board's brief and in Defendant's papers, the Board's interpretations of TILA are enti-

tled to a high degree of deference. Where, as here, a statute is "silent or ambiguous with respect to the specific issue" covered by an authorized and validly promulgated regulation, courts should sustain the regulation so long as it is "based on a permissible construction" of the statute. *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984.) More specifically, in *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980), the United States Supreme Court determined that regulations issued by the Board under TILA are entitled to an even greater degree of deference than that set forth in *Chevron* due to TILA's complexity, the need for uniformity, and evident Congressional intent. The Court held that "[u]nless *demonstrably irrational*, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive." *Milhollin*, 444 U.S. at 565, 100 S.Ct. 790 (emphasis added). *See also Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981) (stating, "Absent some obvious repugnance to the statute, the Board's regulation implementing this legislation should be accepted by the courts, as should the Board's interpretation of its own regulation."); *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232, 238 and 244, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004) (stating "Congress has specifically designated the [Board] and staff as the primary source for interpretation and application of truth-in-lending law" and "judges ought to refrain from substituting their own interstitial lawmaking for that of the [Board]," quoting *Milhollin* ).

Plaintiffs argue that the Ninth Circuit already rejected the positions the Board expressed in its brief by remanding the two TILA claims to this Court. However, the Ninth Circuit's memorandum neither

explicitly or implicitly rejected the Board's positions. Rather, the TILA claims were remanded to allow the parties to undertake discovery that might yield a written deposit agreement that, in conjunction with the promotional materials and the parties' conduct alleged in the complaint, would support or refute Plaintiffs' theory that the ATM cards are credit cards or that Overdraft Limit extends credit.

Plaintiffs also urge the Court to disregard the Board's amicus brief on the ground that it is akin to a mere litigating position entitled to no judicial deference. *See Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212–13, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (stating that "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.") (citations omitted). However, *Bowen* is inapposite. There, the agency was a party to the litigation, and the regulation it was attempting to justify was both retroactive and wholly contrary to the view that the agency advocated in previous cases. *Bowen*, 488 U.S. at 213–14, 109 S.Ct. 468.

█ Indeed, even an agency position articulated for the first time in a litigation brief is entitled to deference when it (1) reflects an agency's "fair and considered judgment on the matter in question," (2) is not a "post hoc rationalization," and (3) is "not plainly erroneous or inconsistent with the regulations." *In re Estate of Covington*, 450 F.3d 917, 920 (9th Cir.2006) (citations omitted). The Board is not a party in this case. As evidenced by the extensive regulatory history set out in the brief, the positions articulated therein reflect the Board's considered judgment. The Board's positions are not post-hoc rationalizations for any of the Board's own acts; indeed, this case does not challenge any of the Board's acts. Contrary to Plaintiffs'

criticisms, the Board's positions are neither plainly erroneous nor inconsistent with TILA or Regulation Z. Furthermore, rather than advancing novel positions, the Board's brief primarily explains positions it has already taken and articulates why it has excluded non-written-agreement courtesy overdraft programs from coverage under TILA and Regulation Z. The Court therefore finds no reason to discount the Board's interpretation of TILA and its own regulations, or to discount the Board's explanation of its positions. The Court therefore adopts the Board's interpretations discussed below.

### b. The Board's Position on Whether Courtesy Overdraft Programs Are Subject to TILA and Regulation Z.

█ In its amicus brief, the Board stated its position that overdraft programs are not subject to TILA disclosures unless those programs are pursuant to a written agreement to pay overdrafts. (Board's Brief 4; RJN Exh. B at 18.) Under Regulation Z, credit disclosures must be made by a "creditor," defined generally as a person "(A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a downpayment), and (B) to whom the obligation is initially payable." 12 C.F.R. § 226.2(a)(17)(i).[2] Each of these two requirements "must be met in order for a particular credit extension to be subject to [Regulation Z]." Official Staff Commentary ("OSC"), 12 C.F.R. Pt. 226, Supp. 1, Comment 2(a)(17)(i)–1. Under the first element of this test, there must be either a written agreement for the borrower to repay the creditor in more than four installments, or a finance charge imposed for the credit (or both). In turn, "credit" is de-

---

**2.** Because, as discussed *infra*, the Court finds that Plaintiffs cannot show that Defendant

satisfies part (A) of the definition, the Court need not address part (B).

fined as "the right to defer payment of debt or to incur debt and defer its payment." 12 C.F.R. § 226.2(a)(14). "Credit card" means "any card, plate, coupon book, or other single credit device that may be used from time to time to obtain credit." 12 C.F.R. § 226.2(a)(15). "Finance charge" is "the cost of consumer credit as a dollar amount," and includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4(a). Notably, the regulation identifies a number of charges that "are not finance charges," including "Charges imposed by a financial institution for paying items that overdraw an account, unless the payment of such items and the imposition of the charge were previously agreed upon in writing." 12 C.F.R. § 226.4(c)(3).

■ The Board analyzed at length the relevant provisions of Regulation Z and stated that fees such as those imposed by Defendant in connection with Overdraft Limit are not "finance charges" within the meaning of TILA. (*See* Board's Brief 5–8; RJN Exh. B at 19–22.) Indeed, analyzing essentially the same regulations, this Court so ruled in its April 26 Order. (*See* April 26 Order 5:14–6:3.) The Ninth Circuit affirmed this Court's ruling, stating that the charges are not incident to extensions of credit, but rather are incident to overdrawn accounts, and therefore are not finance charges. (*See* 201 Fed.Appx. at 410.)

Accordingly, because the charges Defendant imposes for paying overdrafts are not finance charges, Plaintiffs can satisfy the first element of the test for determining whether Defendant is a "creditor" *only* if they show that Defendant's extensions of "credit" are "payable by written agreement in more than four installments." 12 C.F.R. § 226.2(a)(17)(i). The Board noted that "[t]he question of whether the materi-

als provided in the record constitute a written agreement to pay overdrafts is an issue of contract law, and the Board expresses no view on that issue." (Board's Brief 6 fn. 2; RJN Exh. B at 20.) Plaintiffs urge that such an agreement exists.

**c. The Board Considered Extending TILA Coverage to Non–Written–Agreement Overdraft Programs and Declined to Do So.**

■ The Board also explained in its amicus brief that it had considered extending TILA coverage for non-written-agreement overdraft programs and determined not to require TILA disclosures. (*See* Board's Brief 10–15; RJN Exh. B at 24–29.) The Board set out the history of its regulation of so-called "courtesy" overdraft protection programs whereby an institution would informally pay occasional overdrafts for certain customers. From the beginning, the Board viewed courtesy overdraft programs as different from formal overdraft programs, and determined that these courtesy, or non-written-agreement, overdraft programs were not subject to Regulation Z. *See* 34 Fed.Reg. 2002, 2004 (Feb. 11, 1969) (section 226.4(d)) (stating "a charge imposed by a bank for paying checks which overdraw or increase an overdraft in a checking account is not a finance charge unless the payment of the overdraft and the imposition of such finance charge were previously agreed upon in writing.")

Recently, the Board considered whether the more automated overdraft payment programs made possible by changes in technology are sufficiently different from the prior informal arrangements so as to require disclosure under Regulation Z. (*See* Board's Brief 10–15.) For example, in December 2002, when the Board issued proposed revisions to the Official Staff Commentary, it sought "information and comment on how 'bounce protection' ser-

vices are designed and operated and how these services should be treated for purposes of TILA." 67 Fed.Reg. 72,618, 72,620 (December 6, 2002.) The Board described the programs about which it sought comment as follows:

Some financial institutions offer a service to transaction account customers that is commonly referred to as "bounce protection." Institutions apparently provide "bounce protection" in lieu of establishing an overdraft line of credit for the customer. The service varies among institutions and questions have been raised about whether there are circumstances in which the service might be covered by TILA and Regulation Z. Although the institution generally reserves the right not to pay particular items, under these bounce protection programs, the institution typically establishes a dollar limit for the account holder, and then routinely pays overdrafts on the account up to that amount without a case-by-case assessment. Account holders whose overdrafts are paid pursuant to this service are assessed a fee; in some cases it may be the same amount that would be charged for an overdraft item that is returned unpaid or that is paid by the institution on an ad hoc basis.

67 Fed.Reg. 72,618, 72,620 (December 6, 2002). It is undisputed that Defendant's Overdraft Limit program functions in accordance with this description. After the comment period and the Board's adoption of a final rule, the Board stated that its "staff is continuing to gather information on these services, which are not addressed in the final rule." 68 Fed.Reg. 16,185, 16,185 (April 3, 2003).

The Board also considered the issue of overdraft programs in connection with a proposed amendment to its Regulation DD, 12 C.F.R. Part 230, which implements the Truth in Savings Act ("TISA"), 12 U.S.C. § 4301 *et seq.*, the statute that governs disclosures relating to deposit accounts. Therein, the Board proposed amendments to Regulation DD that would require disclosure of overdraft program fees with the initial deposit account disclosures, in the account's periodic statement, and in advertisements, and proposed regulations regarding misleading or inaccurate advertising. 69 Fed.Reg. 31,760, 31,761–31,767 (June 7, 2004). In the final amendments to Regulation DD, the Board adopted many of the provisions in the June 2004 proposal. (*See* 70 Fed.Reg. 29,582 (May 24, 2005).) Of relevance to this case, in the preamble to the regulation, the Board noted that a number of commentaries opposed the amendments to Regulation DD "and instead urge[d] the Board to cover certain overdraft services under Regulation Z." *Id.* at 29,583. The Board did not adopt this approach, stating, "Where the institution has not agreed in writing to pay overdrafts, a charge assessed against a deposit account has not been considered a finance charge and disclosures under Regulation Z are not required. This exception was established in Regulation Z from its inception in 1969. [T]he Board's adoption of final rules under Regulation DD does not preclude a future determination that TILA disclosures would also benefit consumers." *Id.* at 29,588.

It is clear, then, that the Board considered placing non-written-agreement overdraft programs under Regulation Z. It has considered this question both in connection with proposed revisions of Regulation Z itself, and in connection with proposed revisions to Regulation DD. Although the Board did not foreclose the possibility of a future determination that such programs may be subject to TILA, in neither instance did it adopt such a regulation. As such, the Board has made an affirmative determination that non-written-agreement overdraft programs such as Overdraft Limit are not covered by TILA and Regu-

lation Z even if those programs routinely and automatically pay overdrafts. For the reasons stated above, the Board's determination is entitled to this Court's deference and the Court adopts it.

### 3. Plaintiffs' "Credit Agreement" Theory Is Not Supported By Evidence.

█ As stated above, because the overdraft fees are not finance charges, Plaintiffs can prevail on their credit agreement theory only if they can show that Defendant's extensions of "credit" are "payable by written agreement in more than four installments." 12 C.F.R. § 226.2(a)(17)(i). Plaintiffs argue that the Master Agreement and the CS & S Brochure comprise such an agreement.

Following remand, Plaintiffs obtained discovery of the relevant agreements between the parties. It is undisputed that the Account Disclosures applicable when Plaintiffs first opened their accounts were incorporated into the Master Agreement and contained an Overdraft Limit Provision stating that Defendant is not obligated to pay overdrafts and may terminate or reduce the Overdraft Limit at any time; it is also undisputed that all subsequent revisions contain the same provision. (UF 8, 9, 10, 11.) Thus, the plain language of the Account Disclosures makes it clear that Defendant retained discretion whether to pay overdrafts, and that the Account Disclosures did not legally bind Defendant to pay overdrafts. Plaintiffs offer no evidence of any other written agreement. As such, there is no written agreement by which Defendant was obliged to pay the overdrafts. Accordingly, Defendant's payment of overdrafts through Overdraft Limit does not render the ATM cards "credit

cards." It therefore follows that these overdraft payments do not render Defendant a "creditor" within the meaning of TILA.

Plaintiffs urge the Court to interpret the Master Agreement as incorporating the terms of the promotional CS. & S Brochure. If the Court. does so, Plaintiffs contend that the following language contractually obligates Defendant to pay overdrafts: "Don't worry, we'll cover you. We have three options available: Overdraft Limit—Automatic protection provided to all new checking account. Up to your limit, we'll pay your checks—saving you time, money and embarrassment." (Pls' Response to UF 18.)

█ However, as the Court stated in its April 26 Order, promotional materials are not agreements. *Cf. Nicolas v. Deposit Guar. Nat'l Bank*, 182 F.R.D. 226, 230 (S.D.Miss.1998) (construing depository agreement to determine whether parties agreed to payment of items creating an overdraft). Furthermore, it is black-letter law that conversations and writings that occur prior to the execution of a written agreement are inadmissible to change or modify the terms of the agreement.[3] *See* Cal. Civ. Proc § 1856; *Maxwell v. Carlon*, 30 Cal.App.2d 356, 361, 86 P.2d 666 (1939) (stating "the well-known rule" that "things said and done prior to the execution of a contract would be inadmissible to change or modify the terms of a subsequent agreement.") Thus, to the extent that the promotional materials directly contradict a subsequent depository agreement, they will not support Plaintiffs' legal conclusion that the parties agreed in writing to payment of the overdrafts. *See Continental Airlines, Inc. v. McDonnell Douglas*

---

**3.** The written agreement "may be explained or supplemented by evidence of *consistent* additional terms." Cal. Civ. Pro. § 1856(b) (emphasis added), Inherent in Plaintiffs' argu-

ment is the premise that the language of the promotional materials is *inconsistent* with the language of the Account Disclosures.

*Corp.*, 216 Cal.App.3d 388, 418–421, 264 Cal.Rptr. 779 (1990) (finding that a sales brochure was ineffective to vary the terms of subsequent contract). As the Ninth Circuit foreshadowed, if Defendant "introduce[s] evidence of a written deposit agreement with terms contrary to the promotional materials, the cards may well not satisfy the definition of credit cards." (201 Fed.Appx. at 410 fn. 4.) Here, the Account Disclosures contain terms that are contrary to the interpretation of the CS & S Brochure upon which Plaintiff's theory relies. Because that reading of the CS & S Brochure is contradicted by the Account Disclosures, the CS & S Brochure cannot be construed as a contract or as modifying the Master Agreement or the Account Disclosures.[4]

Plaintiffs also argue that a document received from Defendant entitled "Overdraft Line of Credit Agreement and Disclosure" ("ODLOC Agreement") demonstrates that the CS & S Brochure is a written agreement to extend credit. The ODLOC Agreement on its face is an extension of credit because, for example, it imposes a finance change. (*See* Woodward Decl. Exh. C at 1.) To link the ODLOC Agreement and the CS & S Brochure, Plaintiffs cite the language from the Account Disclosures whereby Defendant retains discretion whether to pay overdrafts in both the Overdraft Limit program and the ODLOC program. (Opp'n 11:26–12:22.) Based on this retention of discretion as to both programs, Plaintiffs contend that both programs are extensions of credit, and that therefore the "brochure constitutes a 'credit agreement' in exactly the same way that the 'Overdraft Line of

Credit Agreement and Disclosure' constitutes a credit agreement." (Opp'n 10:19–28; Woodward Decl. Exh. C.)

This argument is fraught with logical fallacies. The simple fact that the Account Disclosures may refer to both programs and may reserve Defendant's discretion whether to pay overdrafts under both programs does not render both programs extensions of "credit." Whether either program extends credit depends on whether the respective program satisfies the relevant definitions set forth in Regulation Z, not on whether both are referenced in Defendant's omnibus Account Disclosures. Nor does the appearance of both programs in the Account Disclosures render Defendant's informational CS & S Brochure functionally equivalent to the formal, separate contract that the ODLOC document plainly is. To the contrary, the contrast between the two documents tends to undermine Plaintiffs' argument: the ODLOC Agreement is a separate, independent, formal agreement with extensive terms setting forth a "credit limit" and finance charges, and including blanks for the "borrower's" identifying information and in which the "borrower" must execute the agreement. The CS & S Brochure, by contrast, is promotional material that merely identifies several features of a number of Defendant's financial products; it does not purport to bind either party as a matter of contract. Furthermore, there is no evidence in the record (nor do Plaintiffs argue) that the "Overdraft Line of Credit Agreement and Disclosure" itself applies to Plaintiffs' accounts: the record contains no such ODLOC Agreement executed by Plaintiffs.

---

**4.** Even were the Court to construe the CS & S Brochure as an agreement or as a modification of the Master Agreement, the Brochure lacks a provision necessary to render Overdraft Limit an extension of "credit" under 12 C.F.R. § 226.2(a)(17)(i). Specifically, there is no evidence that the Brochure provides for repayment of overdrafts "in more than four installments." The CS & S Brochure lacks any such language; instead, it states that customers whose accounts are overdrawn "must bring [their] account[s] to a positive balance *immediately*." (SAC Exh. A (emphasis added).)

Because Plaintiffs have presented no evidence of any written agreement by which Defendant is contractually bound to pay overdrafts in connection with the ATM cards, they cannot prevail on their "credit agreement" theory.

### 4. Plaintiff's "Credit Feature" Theory is Untenable in Light of the Board's Interpretation of TILA and Regulation Z.

 Under its "credit feature" theory, Plaintiffs essentially ask the Court to imply a contract from the conduct of the parties, arguing that doing so would place Overdraft Limit within the ambit of TILA. Specifically, Plaintiffs argue that Defendant's *practice* of routinely and automatically paying all overdrafts gave rise to an agreement *legally obligating* Defendant to pay all overdrafts.

This theory is legally untenable in light of the Board's considered determination, discussed at length above, that non-written-agreement overdraft programs are not subject to TILA and Regulation Z, regardless of whether an entity's payment of overdrafts is routine and automatic.

Because the record evidence refutes Plaintiffs' "credit agreement" theory, and because Plaintiffs' "credit feature" theory is legally untenable, there are no disputed issues of material fact as to Plaintiffs' TILA claims. Defendant is therefore entitled to summary judgment on Plaintiffs' First Cause of Action.

### B. Motion to Dismiss Plaintiffs's State Law Claims.

Defendants move to dismiss Plaintiffs' state law claims on several grounds under Federal Rule of Civil Procedure 12(b)(6). First, Defendants argue that Plaintiffs' second cause of action for violation of California's Business & Professions Code § 17200, *et seq.*, third cause of action for violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750 *et seq.*, and fourth cause of action for unjust enrichment are barred by the doctrine of federal preemption. Specifically, Defendant argues that the pursuant to the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461, *et seq.*, and 12 C.F.R. §§ 557.11 and 560.2, the Office of Thrift Supervision ("OTS") has expressly occupied the entire field of regulating deposit-related and lending-related activities of federal savings associations such as Defendant. Defendant also argues that each of these causes of action is barred under the doctrine of judicial abstention. Finally, Defendant contends that each of these causes of action fails to state a claim upon which relief can be granted.

### 1. Legal Standard for a Rule 12(b)(6) Motion to Dismiss.

 A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. *See* Fed.R.Civ.P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). "The Rule 8 standard contains 'a powerful presumption against rejecting pleadings for failure to state a claim.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir.1997). A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). To survive a 12(b)(6) motion, a complaint "does not need detailed factual allegations," but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 1964–1965, 1968–1969, 167 L.Ed.2d 929 (2007) ("retir[ing]" the "no set

of facts" language of *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

▋ The Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *Pareto v. F.D.I.C.,* 139 F.3d 696, 699 (9th Cir.1998). The complaint must be read in the light most favorable to plaintiff. *Id.* However, the Court need not accept as true any unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

### 2. Plaintiffs' State Law Claims Are Preempted by HOLA.

▋ Defendant argues that Plaintiffs' state law claims must be dismissed because the Office of Thrift Supervision ("OTS") has expressly occupied the entire field of regulating federal savings associations' deposit-related and lending-related activities. In enacting HOLA, Congress vested the Federal Home Loan Bank Board, the predecessor to the OTS, with plenary authority to regulate the operations of federal savings associations. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 144–145, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (discussing Congress's grant of regulatory authority to the Board.) Pursuant to this authority, the OTS has promulgated extensive regulations governing federal savings associations' operations. With regard to the associations' deposit-related activities, the OTS declared in its regulations:

> OTS hereby occupies the entire field of federal savings associations' deposit-related regulations. OTS intends to give federal savings associations maximum flexibility to exercise deposit-related powers according to a uniform federal scheme of regulation. Federal savings associations may exercise deposit-related powers as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect deposit activities, except to the extent provided in § 557.13. State law includes any statute, regulation, ruling, order, or judicial decision.

12 C.F.R. § 557.11(b). The next section, entitled "What are some examples of preempted states laws affecting deposits?" explains, "OTS preempts state laws that purport to impose requirements governing the following[:] (b) Checking accounts; (c) Disclosure requirements; [and] (f) Service charges and fees." 12 C.F.R. § 557.12. The next section identifies the following types of state law as not preempted "to the extent that the law only incidentally affects [ ] deposit-related activities: (1) Contract and commercial law; (2) Tort law; and (3) Criminal law." 12 C.F.R. § 557.13.[5]

▋ "Federal law may preempt state law in three different ways. First, Con-

---

**5.** Although Defendant disputes that its overdraft payments are credit, Defendant contends that to the extent Plaintiffs characterize these payments as extensions of credit, their state claims would also be preempted by the regulation dealing with federal savings associations' *lending*-related activities, 12 C.F.R. § 560.2. The Court need not reach this alternative argument, however, because it has ruled that Overdraft Limit is not an extension of "credit." Section 560.2 is therefore inapplicable. Furthermore, the Court need not address section 560.2 because it finds that section 557.11, dealing with *deposit*-related activities, preempts Plaintiffs' claims. The Court notes, however, that both preemption clauses employ the same language whereby OTS "occupies the entire field," and that both regulations are parallel in structure in that they identify specific examples of state laws preempted and exceptions to preemption. Thus, because the regulations are indistinguishable in their operative language and in their structure, and are both issued by the same agency, this Court finds cases addressing the preemptive scope of section 560.2 to be persuasive with regard to the preemptive scope of sections 557.11, 557.12, and 557.13.

gress may preempt state law by so stating in express terms. Second, preemption may be inferred when federal regulation in a particular field is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. In such cases of field preemption, the mere volume and complexity of federal regulations demonstrate an implicit congressional intent to displace all state law. Third, preemption may be implied when state law actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Bank of Am. v. City & County of S.F.*, 309 F.3d 551, 558 (9th Cir.2002) (internal quotations and citations omitted).

 Although preemption analysis ordinarily begins with a presumption against preemption, that presumption is "not triggered . . . in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). Congress has legislated in the field of banking from the days of *M'Culloch v. Maryland*, 17 U.S.(4 Wheat.) 316, 325–26, 4 L.Ed. 579 (1819), creating an extensive federal statutory and regulatory scheme. *Bank of Am.*, 309 F.3d at 558. Through HOLA and the regulations promulgated by the OTS pursuant to HOLA, Congress has occupied the entire field of lending regulation of federal savings institutions. *Id.*

Relying on *Bank of Am.*, the Court in *Silvas v. E\*Trade Mortgage Corporation*, 421 F.Supp.2d 1315 (S.D.Cal.2006) analyzed the scope of preemption under HOLA and the OTS regulations, and concluded that HOLA and OTS together preempted the plaintiff's Business & Professions Code section 17200 claims. *Silvas*, 421 F.Supp.2d at 1317. In *Silvas*, the plaintiffs asserted that the defendant violated section 17200 in two ways: first, its representations and other disclosures relating to lock-in fees constituted false advertising, and, second, that the defendant's misrepresentations of consumers' rights in advertisements and disclosures amounted to an unlawful business practice. *Id.* Noting that the OTS regulations explicitly occupy the fields of loan related fees and disclosure and advertising, the court concluded that even state remedies, like those provided in section 17200, are preempted. *Id.* at 1319. The same reasoning obtains in the present matter.

In *Weiss v. Washington Mut. Bank*, 147 Cal.App.4th 72, 53 Cal.Rptr.3d 782 (2007), the Court applied section 560.2 to find preemption. Citing OTS's own guidance for determining whether a state law is preempted, the Court stated:

Although 12 C.F.R. § 560.2(c) exempts state tort laws that only incidentally affect the lending operations of federally regulated institutions, the "incidentally affect" analysis is triggered only when dealing with an activity that is not listed in 12 C.F.R. § 560.2(b). According to the OTS, "[w]hen analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed [among the illustrative examples of preempted state laws] in paragraph (b) [of 12 C.F.R. § 560.2]. **If so, the analysis will end there; the law is preempted . . . Any doubt should be resolved in favor of preemption.**" (61 Fed.Reg. 50951, 50966–50967 (Sept. 30, 1996), emphasis added.) It is only if the law is not covered by paragraph (b) that the inquiry continues to determine whether the particular state law affects lending. (*Ibid.*) As noted above and in footnote 2, ante, prepayment penalty provisions are listed among the illustrations in 12 C.F.R. § 560.2(b). For this reason, our inquiry ends here (and we thus do not

discuss Weiss's contention that the relief he seeks would not affect Washington Mutual's "operations" or "lending activities").

*Weiss,* 147 Cal.App.4th at 77, 53 Cal. Rptr.3d 782.

The same analysis governs preemption under section 557.11. *See* 62 Fed.Reg. 54759–01, fn. 12 (discussing public comments about the scope of preemption under section 557.11, stating that the section "merely restates longstanding preemption principles applicable to federal savings' associations operations," and referring to 61 Fed.Reg. 50951 for "a discussion of general preemption principles applicable to the operations of federal thrifts.") Thus, the Court must first consider whether the type of state law in question is listed among the illustrative examples of preempted state laws in section 557.12. Only if the law is not covered by section 557.12 will the Court determine whether the particular state law affects deposit-related activities.

Here, even though all three of Plaintiffs' state law causes of action are pled under laws of general application, those claims seek to impose *requirements governing activities* expressly identified in section 557.12. First, Plaintiffs' section 17200 claim alleges that Defendant engaged in unfair and fraudulent business practices by "intentionally fail[ing] to disclose to Plaintiffs ... that their withdrawals or debit card purchases would result in the overdraft of their accounts ..." (SAC ¶ 34.) The relief Plaintiffs seek is an injunction preventing Defendant from assessing overdraft charges "in the absence of full disclosure to them at the time of ATM withdrawals or debit purchases that they will be overdrawing their accounts ..." (SAC ¶ 37.) Second, and relatedly, Plaintiffs contend in their CLRA claim that Defendant inserted an unconscionable provision in the Account Disclosures by including the Overdraft Limit feature "without re-

vealing to consumers the applicability and high costs of this feature to ATM and debit card transactions at the time consumers accessed their accounts by means of an ATM and/or debit card." (SAC ¶ 41.) Third, the viability of the unjust enrichment claim turns on Plaintiffs' other claims because it alleges that Defendant unjustly collected and retained money as already set forth in connection with the preceding claims. Each of these state law claims therefore rests on allegations concerning how Defendant structures its checking accounts, its disclosure practices, and the reasonableness of its fees. As such, Plaintiffs' state law claims attempt to "impose[ ] requirements governing ... Checking accounts ... Disclosure requirements [and] Service charges and fees." 12 C.F.R. § 557.12.

Plaintiffs cite a number of cases for the proposition that their state law claims are not preempted. The Court has reviewed these cases, and none of them is persuasive. The Court notes the following examples. In *Gibson v. World Savings & Loan Assn.,* 103 Cal.App.4th 1291, 128 Cal. Rptr.2d 19 (2002), the Court held that plaintiffs' unfair and fraudulent business practices claims were not preempted, but on the ground that the plaintiffs alleged violations of *contractual duties* voluntarily undertaken by the parties, *not duties imposed by state law. Gibson,* 103 Cal. App.4th at 1301–1302, 128 Cal.Rptr.2d 19. Similarly, *Hussey–Head v. World Sav. and Loan Ass'n,* 111 Cal.App.4th 773, 4 Cal. Rptr.3d 171 (2003) held that the defendant's voluntary furnishing of credit information to credit reporting agencies was actionable under the California Consumer Credit Reporting Agencies Act and not preempted by HOLA because the defendant's act of providing the credit information did not involve its lending activities. *Hussey–Head,* 111 Cal.App.4th at 781–783, fn. 6, 4 Cal.Rptr.3d 171. *Fenning v. Glenfed, Inc.,* 40 Cal.App.4th 1285, 47 Cal.

Rptr.2d 715 (1995) involved claims for fraud related to a bank's sale of uninsured investment securities, not its deposit or lending-related activities. None of the other cases Plaintiffs cite are any more persuasive than these examples.

Accordingly, for the reasons stated above, Plaintiffs' Second, Third, and Fourth Causes of Action are preempted by HOLA and must be dismissed. Having so ruled, the Court need not reach Defendant's alternative grounds for dismissal.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment on Plaintiffs' First Cause of Action is **GRANTED**, and Defendant's motion to dismiss Plaintiffs' Second, Third, and Fourth Causes of Action as preempted by the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461, *et seq.*, is **GRANTED**.

**SO ORDERED.**